FILED

03/01/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 3, 2018

## BRENT DEWAYNE CARR v. KELLIE RENEA CARR

**Appeal from the General Sessions Court for Overton County**
**No. 2012-CV-65     Daryl A. Colson, Judge**

——————————————————————

## No. M2017-00556-COA-R3-CV

——————————————————————

This is an appeal in a divorce proceeding wherein the Mother of the parties' child appeals the trial court's designation of Father as primary residential parent and designation of the residential parenting schedule, contending that the trial court failed to properly consider Father's history of domestic violence and abuse against her. Upon our review we have determined that the findings of fact and conclusions of law entered by the trial court did not include a discussion of the impact of Tennessee Code Annotated section 36-6-406 on the finding of domestic violence; accordingly, we vacate the decision and remand the case for the court to make appropriate findings in that regard.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court
Vacated; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

William A. Cameron, Cookeville, Tennessee, for the appellant, Kellie Renea Carr.

J. Steve Daniels, Livingston, Tennessee, for the appellee, Brent Dewayne Carr.

## OPINION

Brent DeWayne Carr ("Father") and Kellie Renea Carr ("Mother") were married on December 22, 2009; one child, Gunner, was born of the marriage in July 2011.[1] The parties separated on November 30, 2012, and Father filed a complaint for divorce on December 6, 2012. On February 25, 2013, a document styled "Mediated Agreement" in which the parties resolved all issues as to the division of marital property and debts was

---

[1] One other child was born to Mother while the parties were married; parenting time for that child is not at issue in this appeal.

filed with the court; an agreed Parenting Plan Order was also filed, designating both parties as Primary Residential Parents and granting each 182.5 days of residential parenting time. There is no indication in the record that either document was made the order of the court.

The parties attempted to reconcile without success, and in August 2015 Mother left the home; on August 21, Father filed an ex parte petition for a temporary order seeking to restrain Mother "from interfering with his care, custody and control of [Gunner] . . . pending a hearing on the Restraining Order or a full and final hearing as to the divorce action." The court issued the order, extending it on September 10 to allow Father to secure service of the petition. Mother was served and filed her answer on December 9, denying the salient allegations of the petition.

Trial was held on December 20, 2016. At the conclusion of the trial, the court declared the parties divorced and took matters related to the parenting plan under advisement. On January 10, 2017, the court entered its Findings of Fact and Conclusions of Law, and on February 10 entered the final order, incorporating the Findings and Conclusions, naming Father as Primary Residential Parent and setting out the parenting schedule for Gunner. Mother appeals the designation of Father as primary custodian of Gunner, contending that the designation of Father as primary residential parent is contrary to the preponderance of the evidence and that the court failed to "properly consider the years of substantiated domestic abuse committed by [Father]" in creating the residential parenting schedule.

## DISCUSSION

### I. STANDARD OF REVIEW

"Trial courts have broad discretion in devising permanent parenting plans and designating the primary residential parent." *Burton v. Burton*, No. E2007-02904-COA-R3-CV, 2009 WL 302301, at *2 (Tenn. Ct. App. Feb. 9, 2009). Because decisions regarding parental responsibility often hinge on subtle factors, such as the parent's demeanor and credibility during the proceedings, appellate courts are reluctant to second-guess a trial court's parenting schedule determinations. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Consequently, a trial court's decision regarding a permanent parenting plan will be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). It is not the role of the appellate courts to "tweak [parenting plans] . . . in the hopes of achieving a more reasonable result than the trial court." *Id.*

We review the trial court's factual findings *de novo* upon the record, accompanied by a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R.

2

App. P. 13(d). When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). Accordingly, we will not disturb the parenting plan fashioned by the trial court unless that decision is based on a material error of law or the evidence preponderates against it. *Adelsperger*, 970 S.W.2d at 485.

## II. ANALYSIS

Tennessee Code Annotated section 36-6-404 requires the final order in a divorce action to incorporate a permanent parenting plan for any minor children, defined as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule…." Tenn. Code Ann. § 36-6-402(3) (2017). The residential schedule is to include the designation of the primary residential parent (section 36-6-402(5)), defined as the parent with whom the child resides more than 50% of the time (section 36-6-402(4)), and in developing the plan, the court "shall consider the factors at [section] 36-6-106(a)(1)-(15)."[2] *Id.* § 36-6-

---

[2] Tennessee Code Annotated section 36-6-106(a) states:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:
>
> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
>
> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;
>
> (3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;
>
> (4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;
>
> (5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;
>
> (6) The love, affection, and emotional ties existing between each parent and the child;

3

404(b).  Pertinent to the issues in this appeal, Tennessee Code Annotated section 36-6-406 provides that:

> (a) The permanent parenting plan and the mechanism for approval of the permanent parenting plan shall not utilize dispute resolution, and a parent's residential time as provided in the permanent parenting plan or temporary parenting plan shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:
> * * *
> (2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.

The trial court made the following findings of fact which are pertinent to both the designation of Father as primary residential parent and to Father's history of domestic violence; they also inform our discussion of the issues raised by Mother:[3]

---

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

[3] While Mother cites other evidence in support of her arguments, she does not dispute that there is material evidence in support of the court's findings.

4

1. The Court finds as a fact that this case consists of a marriage of relatively short duration and of this marriage there was a child born, named Gunner Mason Carr, date of birth, July 8, 2011.

2. The Court finds as a fact that the parties experienced marital difficulties during their marriage which resulted in the separation of the parties and a subsequent attempt at reconciliation.

3. The Court finds as a fact that the subsequent reconciliation was not successful and that in August of 2015, Ms. Kellie Renea Carr left the marital home and is currently residing in the Wilson County area of Middle Tennessee.

4. The Court finds as a fact that Gunner Mason Carr, date of birth, July 8, 2011 has been in the care, custody and control of Brent Dwayne Carr since August 2015.

5. That Court finds as a fact that Kellie Renea Carr has not had regular visits with the child since August, 2015 and the Court finds as a fact that she has made no significant child support payments nor has she had significant contact with the child, including only having one (1) visit and only called one (1) time in the last year.

6. The Court finds as a fact that the wife, Kellie Renea Carr admitted to calling in prescriptions of Hydrocodone though she claims she did this because they needed the money. There is some controversy between the parties as to the nature and the extent of the purpose of calling in the prescriptions, but the Court finds as a fact that Kellie Renea Carr admitted to calling in the prescriptions, although the purpose of which is disputed.

7. The Court finds as a fact that the child is currently in school and is doing well in school as testified to by his teacher, Lisa Miller.

8. The Court further finds as a fact that the father is involved in school and participated in the Christmas party and that the child is in the average range in school, however the child needs help with his phonics. This is supported by the testimony of the child's teacher, Lisa Miller.

9. The Court finds as a fact that the child, Gunner Mason Carr is involved in sports, as was testified to by his Coach, Timmy Ray, and that the father is active in the sporting activities and is supportive.

10. The Court finds as a fact that as a result of the significant contact that the father has had with this child over the course of the past fifteen (15) months that Gunner Mason Carr is significantly intertwined with the community of Overton County and is involved in church activities at First Baptist Church as testified to by the father, Brett Dwayne Carr and that Gunner is doing well in school, as testified to by the child's teacher and is involved in sporting activities as testified to by the child's coach, Timmy Ray.

11. The Court finds as a fact that the mother, Kellie Renea Carr has had limited contact and involvement with this child for at least the past fifteen (15) months.

12. The Court finds that Brent Dwayne Carr committed domestic violence against Kellie Renea Carr even though said violence was not reported to the authorities or the police. The Court has considered the testimony of Kellie Renea Carr which in and of itself would not be sufficient to support a finding of domestic abuse, however, the Court is of the opinion that the corroborative proof was sufficient and adequate by a preponderance of the evidence. Specifically, the Court gives credibility to the testimony of Jennifer McKee, who is a teacher at Head Start, who saw multiple bruises on Kellie Renea Carr. The testimony of Tammy Wells, who likewise works at the Head Start, who saw a black eye and a busted lip on the mother and she testified that the mother seemed afraid. The testimony of Christy Peek who saw bruising and black eyes on Kellie Renea Carr. The testimony of Christy Asburn, who is a receptionist, who saw multiple bruises on Kellie Carr. The testimony of Catrina Carr, who is a former babysitter, who testified she saw bruises on Kellie Renea Carr and that she had a black eye purportedly at the hands of her husband. The Court has great concern as to the issue of domestic violence and the Court finds that Brent Dwayne Carr did in fact commit domestic violence against Kellie Renea Carr.

13. The Court finds as a fact that Kellie Renea Carr engaged in conduct which placed this particular child in danger, or risk of serious danger, including the risk of death in that she left this child in a hot vehicle in 2012. The testimony was convincing to the Court that it was during the hot time of the year, that the child was left in car because he was "napping". The child was covered in sweat and the windows were up and according to the testimony of Teresa Carr and Marty Carr who corroborated this incident they were in fear for the child's safety. It must be noted that Teresa Carr nor Marty Carr did not make any reports to the Department of Children's Services regarding this matter, but none the less, the Court finds their testimony to be believable and credible and the Court finds that this event did, in fact, occur. The Court finds as a find of fact that this placed the child, Gunner Mason Carr, in serious risk of harm.[4]

14. The Court finds as a fact that Kellie Renea Carr is currently living with another man, named Gary Wells. The Court finds as a fact that Gary Wells has a felonious record consisting of forgery and perhaps custodial interference.

---

[4] Father's parents testified regarding this matter; contrary to the finding, however, they testified that Mother's other child was the one left in the car.

15. The Court finds as a fact that that those felony convictions are of a property nature and are not the type of felony that would pose a risk of harm to the child directly other to affect the morality and the moral environment of the child should the child be permitted to be around Gary Wells.

16. The Court finds as a fact that Kellie Renea Carr did not keep her house organized, tidy or clean and that the photographs that we entered into trial show a house that was in disarray and perhaps was unsanitary as testified to by Marty Carr and Teresa Carr who indicated that there was dog feces in the home and thus the Court finds that Ms. Kellie Renea Carr did not keep a stable and suitable living environment that would be in the best interest of her minor child.

In its conclusions of law, the trial court stated that it was "consider[ing] each and every factor contained in TCA § 36-6-106 (a)(1)-(10)"[5]; the court then proceeded to

---

[5] The factors in the previous version of section 36-6-106(a) (2014) are:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;
(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;
(4) The stability of the family unit of the parents or caregivers;
(5) The mental and physical health of the parents or caregivers. The court may, when it deems appropriate, order an examination of a party pursuant to Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party pursuant to § 33-3-105(3). The court order required by § 33-3-105(3) shall contain a qualified protective order that, at a minimum, expressly limits the dissemination of confidential protected mental health information for the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;
(6) The home, school and community record of the child;
(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;
(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;
(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear

7

discuss the evidence and reach a conclusion regarding the parent in whose favor a particular factor weighed. The version of the statute used by the court contained ten factors; this statute, however, was repealed by Acts 2014, chapter 617, section 4, and replaced by the fifteen factors quoted in footnote 2, above, effective July 1, 2014. Mother does not contend that the court erred in applying an incorrect version of the statute and in her brief on appeal she discusses the fifteen factors in the current version; in his brief Father details the evidence which supports the conclusions reached by the court. Because we resolve this case as a matter of law, we do not deem it necessary to review the record to determine where the preponderance of the evidence lies relative to the factors not discussed by the trial court. *See Ganzevoort*, 949 S.W.2d at 296.

The trial court held that six of the ten factors weighed in favor of father, two were weighed equally, and one was not applicable; the factor that is the basis of Mother's appeal is the court's holding relative to factor 8, which is supported by factual finding 12, quoted above:

> When considering factor eight of physical and mental abuse to the child or the other parent; the Court does have concerns about Brent Dwayne Carr. The Court has previously made a finding of fact that Mr. Brent Carr engaged in physical violence against Kellie Renea Carr. The Court struggled greatly with this issue as the Court finds that Mr. Carr was abusive to his wife. The Court has great concern that this young child will be placed with a man that has engaged in physical abuse of his wife. In conclusion with struggling with this issue, the Court has reviewed the totality of the best interest and the factors in this case and finds that this does not overcome the court's opinion that the child be placed with the father. There has been no evidence presented that Mr. Carr has been

preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

abusive to this child. The Court finds that the abuse was directed toward the former spouse and that is concerning. In reviewing the totality of the interest set forth in this statute and the best interest of the child the Court gives that weight, but does not feel that it is compelling to overcome the rest of the factors in this chapter.

Father does not contest the factual finding that he committed domestic violence against Mother. Mother argues that designating Father as primary residential parent and the allocation of residential parenting time runs counter to this holding and the evidence upon which it is based.

Mother contends that she should have been named primary residential parent and Father's parenting time should have been reduced due to his physical and verbal abuse; that the trial court overlooked the efforts Mother has taken to get her life back together after years of abuse; and that the court failed to properly assess Father's fitness to raise Gunner in light of his history of abuse.

The trial court found that Father committed domestic violence against Mother, a finding with which the court "struggled greatly" and which caused the court "great concern." From the record, however, we cannot determine the extent to which the court took the requirement of Tennessee Code Annotated section 36-6-406(a)(2) into account in designating Father as primary residential parent and in developing the residential parenting time schedule.[6] Moreover, it does not appear from either the court's findings or its conclusions that the court considered the testimony of Dr. Tara LeMaire, a physician for whom Mother worked, who observed and treated Mother, and opined as to the effect of Father's abuse on Mother.[7] In addition to invoking section 36-6-406(a)(2), Dr.

---

[6] Under the parenting plan adopted by the court, Mother has 96 days of residential parenting time per year and Father has 269 days.

[7] With respect to her observations of Father's behavior Dr. LeMaire testified:

> Q. Okay. Was that consistent with what you saw happening, the dynamics?
> A. And that was also consistent with her concerns.
> Q. Okay. Go ahead.
> A. His interactions with her and the children were always consistent with battered wife syndrome. She was fearful of him. Everything she did and said were in an effort not to invoke anger. Because he would be angry. He would do this, or he would do that, or he would hit her. And on one occasion when we went out to lunch, he showed up where we were. He was waiting for us outside, followed us to lunch and sat and watched us while we ate.
> Q. Is that typical, in your opinion, of battered wife syndrome and controlling behavior?
> A. It is. It is. It is. Everything he ever did was very typical of everything she reported.

LeMaire's testimony places some of Mother's testimony regarding her fear of Father, her leaving the family home and establishing a new home in a different county, and her reluctance to do anything that would incite Father in a different context; this was not discussed by the court.

Tennessee Code Annotated section 36-6-406(a)(2) embodies a statutory mandate. *See In re Emma E.*, No. M2008-02212-COA-R3-JV, 2010 WL 565630, at *7 (Tenn. Ct. App. Feb. 17, 2010) (stating that, pursuant to the statute, "[i]f the court determined that Father physically, sexually, or emotionally abused Mother, it would have been bound to limit Father's parenting time to some degree."); *see also Jacobsen v. Jacobsen*, No. M2012-01845-COA-R3-CV, 2013 WL 1400618, *4 (Tenn. Ct. App. April 5, 2013). The decision to name Father as primary residential parent and to adopt the residential parenting schedule is also affected by the court's findings relative to certain behavior of Mother, particularly her home environment and an incident wherein the court found Mother put Gunner in danger by leaving him in a hot car.[8] In short, there is also evidence which might invoke provisions of Tennessee Code Annotated section 36-6-406(d).[9]

---

Q. Okay. Okay. Did you make a diagnosis that she was suffering from battered wife syndrome?
A. I don't believe that syndrome was in my diagnosis, but I do believe I had noted in my record that I believed she was the victim of the abuse.
Q. Right. Okay.
A. I did not go so far as to put "battered wife syndrome" in my diagnosis because I felt like that was a psychological diagnosis. And I'm not a psychiatrist.

[8] This finding is not supported by the evidence, in that Father's parents, who testified about the incident, both stated that it involved Mother's daughter, not Gunner.

[9] Tennessee Code Annotated section 36-6-406(d) states:

(d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:
(1) A parent's neglect or substantial nonperformance of parenting responsibilities;
(2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;
(3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;
(4) The absence or substantial impairment of emotional ties between the parent and the child;
(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;
(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;
(7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or

10

A trial court abuses its discretion when it fails to consider the applicable law and relevant facts in reaching its decision. *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth*. 249 S.W.3d 346, 358 (Tenn. 2008). An abuse of discretion occurs if a trial court causes an injustice to a party by "(1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).[10] The *Beecher* Court directs appellate courts to review a lower court's discretionary decision to determine:

> (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

*Id*.

Our ability to review the decisions to designate Father as primary residential parent and to adopt the parenting plan, affording the trial court the deference called for by the standard of review, is limited because the court did not identify and apply the appropriate legal principle, specifically Tennessee Code Annotated section 36-6-406, in making the decisions. Consistent with our standard of review, this a determination more appropriately made by the trial court.

---

(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

[10] The Supreme Court described the abuse of discretion standard of review thusly:

The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc*., 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ*., 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co*., 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc*., 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

*Beecher*, 312 S.W.3d at 524 (Tenn. 2010).

11

**CONCLUSION**

For the foregoing reasons, we vacate the decision and remand the case for the trial court to make appropriate findings of fact and conclusions of law as to the impact of section 36-6-406 on the evidence presented.

_____

RICHARD H. DINKINS, JUDGE